## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | |
|---|---|
| **MUNICAP, INC.**<br>**8965 Guilford Rd.,**<br>**Columbia, Maryland 21046**<br><br>    Plaintiff,<br><br>v.<br><br>**THADDEUS WILSON**<br>**173 Wentworth St.**<br>**Charleston, South Carolina 29401**<br><br><br>    Defendant. | Civil Case No.: _____ |

## **COMPLAINT**

Plaintiff MuniCap, Inc. ("MuniCap"), by and through undersigned counsel, hereby brings suit against its former employee, Thaddeus Wilson ("Wilson") for breach of contract, tortious interference with contractual and business relationsh, and for violations of the Maryland Uniform Trade Secrets Act, Md. Code Com. Law Code, § 11-1201 *et seq*. Accordingly, Plaintiff seeks declaratory, equitable, injunctive, and monetary relief.

## **JURISDICTION & VENUE**

1.       This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1332 because there is complete diversity of citizenship between the Parties, and the amount in controversy exceeds $75,000.  Diversity of citizenship exists because the corporate Plaintiff is a citizen of Maryland, whereas the Defendant is a citizen of South Carolina.

2. Venue and personal jurisdiction are proper pursuant to 28 U.S.C. § 1391. Plaintiff MuniCap is headquartered in this Judicial District, Defendant performed work as an employee for MuniCap—a Maryland company—and Defendant is currently subject to an Employee Confidential Information and Consulting Agreement. All of the contracts at issue in this dispute with MuniCap were entered into by MuniCap in its corporate capacity. These contracts were all approved and signed in Maryland. The contracts have been administered in Maryland, including billing and collecting fees on these contracts, which have all been done by MuniCap in its Maryland office. Governmental compliance related to the work conducted by Wilson, including the Securities and Exchange Commission (SEC) and Municipal Securities Rulemaking Board regulations, was all provided by the Maryland office. All payments to Wilson were paid by and from MuniCap's office in Maryland in this Judicial District. Wilson's work was supervised from MuniCap's Maryland office. All certifications for the work done by Wilson were approved and provided by the Maryland office of MuniCap. Insurance required by clients has been provided by the Maryland office of MuniCap. Liability for MuniCap's work is to MuniCap, headquartered in Maryland. Professional liability insurance has been provided by the Maryland office.

## **PARTIES**

3. Plaintiff MuniCap is a corporation incorporated in the State of Maryland with its principal place of business located at 8965 Guilford Rd., Columbia, Maryland 21046. Founded in 2002, MuniCap is an experienced public finance consulting firm specializing in public financing related to real estate development. MuniCap is registered as a municipal advisor with the SEC and the Municipal Securities Rulemaking Board, as required by the regulations of these entities for the services provided by MuniCap. At all

times relevant to this Complaint, MuniCap was incorporated in Maryland and has had its principal place of business located in Columbia, Maryland 21046.

4. Thaddeus Wilson is a resident and citizen of the State of South Carolina and a permanent resident of the United States. From December 9, 2008 to April 12, 2024, Wilson was employed by MuniCap with his most recent title being Executive Vice President.

**FACTS**

5. On December 8, 2008, MuniCap made an offer of employment to Wilson for the position of Vice President. On this date, Wilson was provided with an offer letter that stated, "Your position will include significant exposure to corporate trade secret information. This information is subject to restrictions by the Uniform Commercial Code (UCC) and the 'Employee Confidential Information and Consulting Agreement' attached to this letter."

6. Attached to the offer letter was an Agreement titled "Employee Confidential Information and Consulting Agreement" ("the Agreement"). According to the Agreement, Wilson agreed that he would:

> "not disclose to anyone outside of the Company [i.e., MuniCap] and will not use other than for the benefit of the Company any information of confidential or proprietary nature concerning the Company's or any of its affiliates' business matters of affairs ('Confidential Information') including but not limited to computer models, documents, product plans, strategic and tactical plans, growth plans, business plans, or identity of information about customers/clients and their needs or requirements, all of which shall be considered confidential or proprietary unless Company specifies in writing that it is not confidential or proprietary." *See* Attachment 1, Employment Agreement, ¶1.

7. Paragraph 3 of the Agreement states, "Upon termination of employment, Employee will surrender to the Company all material evidencing any Confidential

Information, which Employee hereby agrees is the sole property of the Company." *Id.* at ¶3.

8. Paragraph 4 of the Agreement states, "In the event Employee's employment with the Company terminates *at the Employee's request,* the Company shall have the right, but not the obligation, to require Employee to provide consulting services to the Company on the terms set forth in this Section 4. ***If the Company chooses to exercise this right, it will inform the Employee within 30 working days of the date of the Employee's resignation.*"** *Id.* at ¶ 4 (emphasis included). Paragraph 4.4.a. states, "During the consulting period, Employee agrees that all clients of the Company, for which the Employee has or will provide services during the Employee's employment by the Company, and all prospective clients from whom the Employee has solicited business while in the employ of the Company shall be solely the clients of the Company." *Id.* at ¶4.4.a.

9. Paragraph 4.4.b. of the Agreement states, "During the consulting Period, Employee agrees that he/she shall neither directly nor indirectly solicit business, contract, or perform work for clients acquired after state date or employment at MuniCap, Inc." *Id.* at ¶4.4.b.

10. Wilson signed and executed the Agreement on December 8, 2008. MuniCap's President, Keenan Rice ("Rice") signed the Agreement on the same day.

11. MuniCap's Employee Handbook – which was distributed to Wilson – clearly states MuniCap's policy against the unauthorized disclosure of confidential and trade secrets.

    a. Section 5-1(2) of the Handbook states that "Stealing, removing or defacing MuniCap, Inc. property or a co-workers property, or

4

      disclosure of confidential information" constitutes workplace misconduct.

  b. Section 5-11 states, "During the course of work, associates may become aware of confidential information about MuniCap, Inc.'s business, including but not limited to information regarding MuniCap, Inc. finances, pricing, products and new product development, software and computer programs, and financial models, marketing strategies, suppliers and customers and potential customers. Associates also may become aware of similar confidential information belonging to MuniCap, Inc.'s clients. It is extremely important that all such information remain confidential, and particularly not be disclosed to MuniCap, Inc.'s competitors. Any associate who improperly copies, removes (whether physically or electronically), uses or discloses confidential information to anyone outside of MuniCap, Inc. may be subject to disciplinary action up to and including termination. Associates may be required to sign an agreement reiterating these obligations." *Id.* at p.36.

  c. Section 5-15 of the Handbook states that employees are "prohibited from any unauthorized use of MuniCap, Inc.'s intellectual property, such as audio and video tapes, print materials, financial models, and software." *Id.* at p.38.

  d. Section 5-17 of the Handbook ("Non-disclosure") states, "The protection of confidential business information and trade secrets is vital to the interests and the success of MuniCap, Inc. Such

> confidential information includes, but is not limited to, the following examples:
>
> - Computer Programs and Codes
> - Customer Lists
> - Customer Preferences
> - Financial Information
> - Marketing Strategies
> - Pending Projects and Proposals
> - Research and Development Strategies
>
> Employees who improperly use or disclose trade secrets or confidential business information will be subject to disciplinary action, up to and including termination of employment, even if they do not actually benefit from the disclosed information." Page 39.

   e. Section 5-29 of the Handbook states, "Employees also must return all of MuniCap, Inc.'s Confidential Information upon separation." *Id.* at p.44.

12. Over the course of the next 15 years, Wilson acted as a Vice President, Senior Vice President, and/or Executive Vice President for MuniCap. In this role, he had unfettered access to confidential information and proprietary documents belonging to MuniCap. In particular, Wilson became intimately familiar with confidential information such as MuniCap's clients, information necessary to provide services to these clients, business models and plans, methodologies, business strategies, communications and negotiations with clients, and pricing and financial information.

6

13. On Friday April 12, 2024, Wilson sent an email to Rice in which he resigned effective immediately.

14. Wilson said he was not available to talk over the weekend, and around 10am on April 15, 2024 (the following Monday), Rice and Wilson had a conversation in which Rice inquired into Wilson's plans for the future. Wilson explained that he planned to go into business for himself, providing similar services to those offered by MuniCap. Wilson further expressed his desire to take the clients he worked with at MuniCap over to his new business. Rice reminded Wilson of his obligations under the Agreement and explained that Wilson's plan to solicit MuniCap's clients would constitute a breach of contract.

15. During their conversation on April 15, 2024, Wilson and Rice discussed Paragraph 4 of the Agreement, which gave MuniCap the option to trigger a 12-month consulting period with Wilson. Wilson expressed his desire that MuniCap not trigger this option and instead allow Wilson to continue working with MuniCap's clients independent of MuniCap. Wilson insinuated that if MuniCap chose to exercise its rights under Paragraph 4 of the Agreement and triggered the consulting arrangement, he would not be cooperative with MuniCap.

16. At 11:13 am on that same day, Monday, April 15, 2024, shortly after the call between Rice and Wilson at 10:00 am, Rice responded to Wilson's resignation email and provided him timely notice pursuant to Paragraph 4 of the Agreement that MuniCap was exercising its right to initiate the 12-month consulting period.

17. On April 15, 2024 at 12:57pm, Rice emailed Wilson and reminded Wilson that, pursuant to the Agreement, Wilson was prohibited from providing similar services to MuniCap's clients in any capacity other than as an independent contractor for MuniCap.

18. On April 15, 2024 at 3:11pm, Rice emailed Wilson and stated, "Thad, I presume you know this from the employment and consulting agreements, but please do not contact any of MuniCap's clients except on behalf of MuniCap and in conjunction with your efforts under the consulting agreement. I would like to be in regular communication with you to coordinate your efforts pursuant to the consulting agreement. Please contact me at your earliest opportunity in this regard." Mr. Wilson has not responded to this email to discuss his consulting services with the company.

19. On April 15, 2024, MuniCap received a phone call from D.R. Horton, Inc. – a client of MuniCap's. While employed with MuniCap, Wilson was the point of contact with this client related to a project in South Carolina. During the April 15 call, this client informed MuniCap that they had been contacted by Wilson. Specifically, Wilson told the client that he longer worked for MuniCap, and he offered to continue to provide similar services to the client through his new business endeavor – Water Street Public Finance. Following this conversation with D.R. Horton, Inc., Rice emailed Wilson on April 15, 2024 at 5:50pm and wrote, "I did hear from one client today that you had contacted them to let them know you were no longer employed by MuniCap but that you were willing to work for them…I will be their new point of contact, and as a result of your agreement with MuniCap, you are not able to work for them without our consent." In this email, Rice also explained to Wilson, "government agencies will require a consent to assignment signed by MuniCap. They will also require that you are legally able to do the proposed work. I am not prepared to consent to an assignment, and under your agreement with MuniCap, you cannot accurately represent you are legally able to do the work."

20. During his employment with MuniCap, Wilson served as the point of contact with another client, Youngblood Development Company, LLC ("Youngblood").

8

Once MuniCap and Youngblood agreed on the terms of a contract, Wilson sent the agreement to Youngblood for execution. Although Youngblood returned a signed counterpart of the agreement to Wilson on or around April 10, 2024, Wilson deliberately withheld this information from Rice and did not send the agreement to Rice for final execution. After Wilson's resignation, Youngblood followed up with Wilson on April 15th to ask for MuniCap's signed counterpart. This email was automatically forwarded to Rice, who was shocked to learn that Wilson had attempted to withhold Youngblood's signed counterpart from Rice and prevent final execution of the agreement. Upon information and belief, Wilson attempted to solicit Youngblood's business for himself, and obstructed the execution of MuniCap's contract with Youngblood in order to facilitate his plan to solicit Youngblood's business.

21.     Prior to Wilson's resignation, MuniCap signed a contract with the City of Hardeeville, South Carolina, in which MuniCap would provide services related to funding for the construction of a new highway exit ("Exit 3"). During his employment with MuniCap, Wilson worked closely with this client (i.e., the City of Hardeeville) and gained knowledge of valuable confidential information and trade secrets regarding this contract, including but not limited to, Hardeeville's specific needs, information on the costs and use of the improvements to be provided, the terms of MuniCap's contract with Hardeeville, MuniCap's plans and strategy for assisting with the funding for Hardeeville, and the rates offered to Hardeeville by MuniCap to meet these needs.

22.     On April 15, 2024, Rice contacted its client the City of Hardeeville to notify Hardeeville that their previous point of contact, Wilson, had resigned, and that Rice would serve as the new point of contact.

23. The following day, on April 16, 2024, Rice was notified by Hardeeville that they had elected to terminate the contract with MuniCap.

24. On April 16, 2024, Rice received a letter from Wilson, through counsel, threatened to pursue a groundless civil suit against Rice and MuniCap if Rice/MuniCap attempted to stop Wilson's efforts to solicit MuniCap's clients and his interference with MuniCap's contracts.

25. Rice suspected that Wilson had solicited Hardeeville as a client for his own business, and induced Hardeeville into terminating its contract with MuniCap. These suspicions were confirmed when email communications between Wilson, representatives from Hardeeville, and third parties involved in the Exit 3 project were accidentally sent to Wilson's old MuniCap email address, which was automatically forwarded to Rice. This email thread revealed that Wilson initiated contact with these contractors using his new business' email address to discuss work he was doing for Hardeeville on the highway exit project. These accidentally disclosed email threads revealed that Wilson had solicited Hardeeville and has been providing public financing services to Hardeeville in MuniCap's place.

26. On April 20, 2024, Wilson emailed a draft "Rate and Method of Apportionment of Assessment" ("RMA") document to Samuel Howell – an attorney working on the Hardeeville Exit 3 project. The RMA sent by Wilson was essentially a verbatim copy of confidential RMA document that Wilson gained access to through his employment with MuniCap, with minor alterations. The assessment methodology used by MuniCap was developed by MuniCap and is unique in the industry. The document that Wilson sent to Howell retained considerable amounts of MuniCap's confidential information and trade secrets, including but not limited to, methodologies developed by

10

MuniCap related to the allocation of Bond Assessments to various property types, reductions in the Bond Assessments, reallocations of the Bond Assessments to properties, credits available in the payment of the Bond Assessments, methods of determining annual payments of the Bond Assessments to be collected each year, and prepayment of the Bond Assessments (among other terms). This methodology is not generally used in the industry apart from MuniCap; the information in the RMA form and its methodology are not readily available, and Wilson was only able to provide this information to Howell because of his access to confidential information while with MuniCap.

27. On April 23, 2024, Nicole Scott – an attorney with Maynard Nexsen – accidentally sent an email to Wilson's old MuniCap email address, revealing that Wilson solicited another MuniCap client – SRE Santini, LLC – to provide work on the "Citadel Mall" project.

28. In her April 23rd email, Ms. Scott sent Wilson multiple documents – at Wilson's request – related to the Citadel Mall project. MuniCap currently has a contract with SRE Santini, LLC regarding this project; however, Wilson has intercepted these documents (as well as other documents) and did not forward them to MuniCap, thereby preventing MuniCap from performing the work it was contracted to do on the Citadel Mall and other projects. Since Wilson's resignation, SRE Santini, LLC and a number of other clients have stopped reaching out to MuniCap to do work on the Citadel Mall and other projects, and instead, this work is being done by Wilson on behalf of his new company, Water Street.

29. On April 23, 2024, the City of North Myrtle Beach – another client of MuniCap – wrote to MuniCap to notify them of their intent to terminate their Consulting

Services Agreement. Upon information and belief, Wilson solicited this client and is now performing services similar to those of MuniCap, in MuniCap's place.

30. On April 25, 2024, Fritz Meyer of MuniCap's client Weber USA Corporation accidentally sent an email to Wilson's old MuniCap email which stated, "Thad, It was great seeing you yesterday" and proceeded to provide Wilson with multiple documents related to the Ingleside development – i.e., a project that MuniCap contracted to work on for Weber. As with the Citadel Mall project, Wilson redirected critical documents from MuniCap's client and did not forward them to MuniCap, thereby preventing MuniCap from performing the work it was contracted to do on the Ingleside project. Since Wilson's resignation, Weber has stopped reaching out to MuniCap to do work on the Ingleside project, and instead this work is being done by Wilson on behalf of his new company, Water Street.

31. Following Wilson's resignation on April 12th, MuniCap emailed Wilson and instructed him to return his company computer, which contains a multitude of confidential files and trade secrets. Wilson disingenuously claimed that he needed to retain his company computer in order to provide consulting services under the terms of his Agreement, despite the fact that his MuniCap computer is not necessary for Wilson to provide consulting services to MuniCap. Wilson never intended to perform any consulting services for MuniCap, and to this date he has not provided any consulting services for MuniCap. Instead, he retained his MuniCap laptop to pilfer MuniCap's confidential information and trade secrets – such as information on MuniCap's projects and clients, along with MuniCap's financial models and RMA's – in order to aid his solicitation of MuniCap's clients.

32. MuniCap's client, Public State Ports Authority, was scheduled to have a conference call with MuniCap related to the Union Pier project. However, the Public State Ports Authority inexplicably cancelled the meeting and has ceased communications with MuniCap on this project. Upon information and belief, Wilson solicited this client and is now providing services on this project on behalf of his new company.

33. For each MuniCap client that Wilson has solicited away from MuniCap, Wilson has used and relied upon MuniCap's confidential information and trade secrets in order to provide services to these clients. This information includes, but is not limited to, data related to the cost of the projects, development plans for particular properties, and the results of calculations obtained through the use of MuniCap's computer models. These models are comprised of highly complex calculations that were developed by MuniCap and are not publicly available.

34. Pursuant to Section 15 of the Securities Exchange Act, many of the services provided by MuniCap require registration with the SEC and Municipal Securities Rulemaking Board as a municipal advisory firm. Any employee who engages in municipal financial activities on behalf of a municipal entity or an obligated person (a non-governmental entity) must be registered as a municipal advisor representative. As an employee of MuniCap, Wilson was registered as a municipal advisory representative and provided municipal advisory services for MuniCap, which is a registered municipal advisory firm. However, upon his resignation from MuniCap, Wilson's registration as a municipal advisor representative was cancelled. Wilson is prohibited from providing many of the services provided by MuniCap without being registered as a municipal advisor representative, which requires registration under a municipal advisory firm. As of the date of this filing, Wilson is not registered as a municipal advisor representative,

and his business—Water Street Public Finance—is not registered as a municipal advisory firm, as shown on the Electronic Municipal Market Access, the official repository operated by the Municipal Securities Rulemaking Board to identify registered firms and representatives. Accordingly, Mr. Wilson is not legally able to provide many of the services provided by MuniCap to its clients. Wilson has solicited MuniCap's clients to do work that he is prohibited from doing by SEC regulations.

<b><u>CAUSES OF ACTION</u></b><br><b><u>COUNT I: BREACH OF CONTRACT</u></b>

35. MuniCap adopts and incorporates by reference all of the factual allegations in the foregoing paragraphs.

36. The Employee Confidential Information and Consulting Agreement signed and executed by the Parties on December 8, 2008 is a valid and legally binding contract.

37. This Agreement explained the nature and importance of "Confidential Information" that Wilson would have access to during his employment. Wilson agreed not to disclose this confidential information to anyone outside of MuniCap and not to use this confidential information for any purpose other than for the benefit of MuniCap.

38. This Agreement further stated that the Parties agreed that, during the consulting period, the clients that Wilson provided services for would remain the exclusive clients of MuniCap, and Wilson would not to (either directly or indirectly) solicit, contract with, or perform work for MuniCap's clients.

39. This Agreement further stated that upon termination of Wilson's employment, he agreed to surrender all Company material containing any confidential information.

40. Wilson breached this Agreement by failing to return his MuniCap laptop containing Confidential Information; utilizing files and documents containing MuniCap's confidential information, including but not limited to: important information on MuniCap's clients, information necessary to provide services to these clients, business models and plans, methodologies, business strategies, communications and negotiations with clients, and pricing and financial information; utilizing MuniCap's confidential information to strategically gain an unfair advantage over MuniCap, undercut MuniCap's prices, and solicit MuniCap's clients, thereby inducing MuniCap's clients to cease their business operations with MuniCap and turn to Wilson to provide these same services in MuniCap's place

41. Each client that Wilson has solicited away from MuniCap was acquired by MuniCap after his employment with MuniCap began.

42. Each client that Wilson has solicited away from MuniCap previously signed a confidentiality agreement with MuniCap preventing the client from disclosing the details of their business interactions with MuniCap – including the details of the projects they are working on together – to any third parties.

43. As a result of Wilson's material breaches, MuniCap's competitive advantage has been severely undermined, and multiple clients have either stopped utilizing MuniCap's services, and in one case, have outright terminated their contract with MuniCap.

44. Wilson's material breaches have caused irreparable harm to MuniCap. This harm is ongoing and stands to result in upwards of $1,000,000.00 in losses for MuniCap.

**COUNT 2:**
**TORTIOUS INTERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONS**

45. MuniCap adopts and incorporates by reference all of the factual allegations in the foregoing paragraphs.

46. MuniCap entered into contractual relationships with its clients, including but not limited to D.R. Horton, Inc., Youngblood Development Company, LLC, the City of Hardeeville, SRE Santini, LLC, the City of North Myrtle Beach, Weber USA Corporation, and Public State Ports Authority.

47. As the point of contact for these clients while employed with MuniCap, Wilson was aware of MuniCap's contracts with these clients.

48. Wilson interfered with MuniCap's contractual relations with its clients through improper means when he misrepresented to these clients that he was registered to perform services for them, or failed to disclose that he was not registered to perform services for them; when he threatened MuniCap with frivolous litigation if MuniCap attempted to stop his solicitation campaign; when he misappropriated MuniCap's trade secrets in violation of MUTSA; when he redirected confidential documents from MuniCap's clients to his own business; and when he unlawfully retained MuniCap's company computer in order to steal confidential files from said computer.

49. Wilson's interference with MuniCap's contractual relations was without legal justification, was intentional, and was done with an improper and malicious motive to injure MuniCap and benefit himself at MuniCap's expense.

50. As a result of Wilson's actions, he has induced several of MuniCap's clients to cease utilizing MuniCap's services, and in two cases, he has induced them into outright terminating their contracts with MuniCap.

51. As a result of Wilson's intentional conduct, MuniCap has suffered and will continue to suffer lost profits and other consequential damages.

## COUNT 3:

## VIOLATIONS OF THE MARYLAND UNIFORM TRADE SECRETS ACT

52. MuniCap adopts and incorporates by reference all of the factual allegations in the foregoing paragraphs.

53. MuniCap is the owner of trade secrets within the meaning of Md. Code, Com. Law, § 11-1201 (these include, but are not limited to, information on MuniCap's clients; MuniCap's business plans; MuniCap's computer models, methodologies, plans, and formulas; MuniCap's pricing information; the details of MuniCap's projects with clients, as well as any and all documents related to MuniCap's projects with their clients; and communications with MuniCap's clients). This information is not generally known, is not readily ascertainable by MuniCap's competitors, and is only known by Wilson as a result of his prior employment with MuniCap and his access to confidential information.

54. MuniCap took significant steps to safeguard the confidentiality of the above listed information: it required Wilson to sign an employment agreement containing confidentiality and non-solicitation provisions, it distributed an employee handbook with explicit confidentiality provisions, it exclusively stored this information on the MuniCap computer network with limited and controlled access, and it sent Wilson repeated emails reminding him of his obligations to maintain the secrecy of this information.

55. The above-listed information has independent economic value and derives its value from its secrecy. If this information were made publicly available, it would lose its value, as MuniCap's competitors would be able to reap the benefits of this information

without the associated costs, and gain an unfair competitive advantage by undercutting MuniCap's prices.

56. Wilson misappropriated MuniCap's trade secrets when he improperly retained his MuniCap's laptop under the guise that he needed to it perform consulting services, only to pilfer the trade secrets contained on the computer and transmit these documents without MuniCap's consent; when he utilized the trade secrets to undercut MuniCap's competitive advantage and to provide similar services to MuniCap's clients; when he utilized MuniCap's models and formulas to perform calculations and provide estimates to MuniCap's clients; when he redirected documents that should have been sent to MuniCap to his new business' email address; when he misrepresented to MuniCap's clients that he was authorized to provide services that require registration as a municipal advisor.

57. Wilson misappropriated MuniCap's trade secrets for his own competitive advantage and for the competitive advantage of his company – Water Street Public Finance.

58. Wilson was aware that the above-listed information belonged to MuniCap and were trade secrets when he misappropriated them and did so knowing that he had a duty to maintain the secrecy of these trade secrets.

59. As a result of Wilson's misappropriation of MuniCap's trade secrets, MuniCap's competitive advantage has been severely undermined, and multiple clients have either stopped utilizing MuniCap's services, and in two cases, have outright terminated their contract with MuniCap.

60. Wilson's material breaches have caused irreparable harm to MuniCap. This harm is ongoing and stands to result in upwards of $1,000,000.00 in losses for MuniCap.

## PRAYER FOR RELIEF

**WHEREFORE, MuniCap respectfully requests that the Court:**

A.  Enter judgment in MuniCap's favor against Wilson;

B.  Award MuniCap monetary damages (in an amount to be determined at trial, but no less than $75,000) to compensate MuniCap for the actual loss and unjust enrichment caused by Defendant's breach of contract, tortious interference, and misappropriation of MuniCap's trade secrets; or, alternatively, award MuniCap a reasonable royalty or other amount for Defendant's breach of contract and unauthorized disclosure and use of MuniCap's trade secrets and confidential information;

C.  Award MuniCap exemplary damages in an amount equal to twice the amount of all other monetary damages, as Defendant's misappropriation was willful and malicious;

D.  Enter a temporary restraining order, and preliminarily and permanently enjoin Defendant from continuing to violate his Agreement, tortiously interfering with MuniCap's contractual and business relations, and from using, disseminating, or retaining any of MuniCap's clients and trade secrets;

E.  Award MuniCap its costs and expenses in pursuing this action, including reasonable attorneys' fees;

F.  Grant such and other relief as the Court deems just and proper.

Respectfully submitted,

_____/s/_____

Aron Zavaro, No. 21675

Guru V. Shanmugamani ("Vijay Mani"), No. 19147

THATCHER ZAVARO & MANI
Belle Point Office Park
7849 Belle Point Drive
Greenbelt, MD 20770

Telephone: (301) 441-1400
Facsimile: (301) 441-9602

*Counsel for Plaintiff*

20