## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| MUNICAP, INC. | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Case No.: SAG-24-1274 |
| v. | * | |
| | * | |
| THADDEUS WILSON, *et al.* | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

Plaintiff MuniCap, Inc. ("MuniCap"), a Maryland-based public finance consulting firm, originally filed this lawsuit against its former employee, Thaddeus Wilson, alleging that Wilson's post-termination conduct violated the terms of his employment contract and the Maryland Uniform Trade Secrets Act, Md. Code. Ann., Com. Law, § 11-1201, *et seq*. ECF 1. Following preliminary motions practice and the commencement of discovery, MuniCap amended its complaint to add claims against Water Street Public Finance, LLC ("WSPF"), a single-member LLC operated by Wilson. ECF 63.

WSPF has filed a motion to dismiss the claims against it, citing a number of grounds, including lack of personal jurisdiction. ECF 86. MuniCap opposed the motion, ECF 90, and WSPF filed a reply, ECF 92. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). Because this Court agrees that it lacks personal jurisdiction over WSPF, it will transfer venue of this case to the District of South Carolina pursuant to 28 U.S.C. § 1406 and will defer adjudicating the remaining arguments in WSPF's motion.

I.    **BACKGROUND**

The following facts are largely derived from the Amended Complaint, ECF 63, and from the exhibits to WSPF's motion to dismiss, ECF 86.

MuniCap is a Maryland-based public finance consulting firm specializing in public financing related to real estate development. ECF 63 ¶ 3. Defendant Thaddeus Wilson is a citizen of South Carolina who was employed by MuniCap from December 9, 2008, to April 12, 2024. *Id.* ¶ 4. WSPF is a limited liability company headquartered and organized in South Carolina. *Id.* ¶ 5. WSPF was incorporated on April 11, 2024. ECF 86-2. Wilson is its president and sole member. ECF 63 ¶ 5. WSPF has no members or employees who reside or work in Maryland, has no equipment or computer servers in Maryland, and has no clients in Maryland. ECF 86-5 ¶¶ 9–11.

Upon his hiring at MuniCap, Wilson received a detailed offer letter, stating that, "Your position will include significant exposure to corporate trade secret information. This information is subject to restrictions by the Uniform Commercial Code (UCC) and the 'Employee Confidential Information and Consulting Agreement' attached to this letter." ECF 63 ¶ 6. The Employee Confidential Information and Consulting Agreement ("the Agreement"), which was attached to the offer letter, further elaborated that by accepting employment at MuniCap, Wilson agreed that he would:

> not disclose to anyone outside of the Company [i.e., MuniCap] and will not use other than for the benefit of the Company any information of confidential or proprietary nature concerning the Company's or any of its affiliates' business matters of affairs ('Confidential Information') including but not limited to computer models, documents, product plans, strategic and tactical plans, growth plans, business plans, or identity of information about customers/clients and their needs or requirements, all of which shall be considered confidential or proprietary unless Company specifies in writing that it is not confidential or proprietary.

*Id.* ¶ 7; ECF 1-3 ¶ 1. The Agreement required an employee to return all confidential information to MuniCap upon termination, and clarified that any confidential information was MuniCap's property. ECF 63 ¶ 8.; ECF 1-3 ¶ 3. Finally, in the event that an employee decided to end his employment with MuniCap, the Agreement provided MuniCap with an option to require the employee to provide consulting services to MuniCap after termination—essentially, a noncompete agreement. ECF 63 ¶ 9; ECF 1-3 ¶ 4. MuniCap was required to inform a former employee of whether it intended to exercise the right within thirty business days of the employee's resignation. ECF 63 ¶ 9; ECF 1-3 ¶ 4. If MuniCap exercised the right, during the consulting period, the former employee agreed that all clients of MuniCap or prospective clients of MuniCap he had worked with during his employment would be considered the clients of MuniCap, and that he would not solicit business from, contract with, or perform work for those clients during the consulting period. ECF 63 ¶ 9–10; ECF 1-3 ¶ 4.4. Wilson signed the letter and the Agreement in 2008. ECF 63 ¶ 11. He also received a copy of MuniCap's employee handbook, which outlined policies surrounding confidentiality and trade secrets. *Id.* ¶ 12.

Throughout his fifteen-year employment, Wilson had access to MuniCap's confidential information and proprietary documents, and, in particular, client information. *Id.* ¶ 13. He was an Executive Vice President when he resigned via email on April 12, 2024. *Id.* ¶¶ 4, 14. Wilson spoke with MuniCap President Keenan Rice the following Monday, April 15, 2024, and indicated that he planned to go into business for himself and hoped to take the clients with whom he had worked while employed at MuniCap with him. *Id.* ¶¶ 11, 15. Wilson and Rice discussed MuniCap's option of exercising its right to a twelve-month consulting period. *Id.* ¶ 16. Wilson "insinuated that if MuniCap chose to exercise its rights . . . he would not be cooperative." *Id.* MuniCap informed Wilson (through an email from Rice) that it would exercise its right to a twelve-month consulting

period that same morning. *Id.* ¶ 17. Early that afternoon, Rice emailed Wilson again and reminded him that, under the Agreement, he was prohibited from doing business with MuniCap's clients for the duration of the consulting period, unless he was doing so on behalf of MuniCap. *Id.* ¶ 18. Two hours later, Rice emailed Wilson a third time, reiterating that Wilson was not permitted to contact MuniCap clients except on behalf of MuniCap. *Id.* ¶ 19.

But later that same day, a MuniCap client, D.R. Horton, Inc., informed MuniCap that it had been contacted by Wilson, who was seeking to continue working with D.R. Horton, Inc. through his new business, WSPF. *Id.* ¶ 20. Rice emailed Wilson to express that, per the Agreement, he could not work for D.R. Horton, Inc. without MuniCap's consent. *Id.* He further explained that any work with a government agency (like D.R. Horton, Inc. and most MuniCap clients, as a municipal consulting firm) would require a consent to assignment signed by MuniCap, and that MuniCap was not prepared to consent to an assignment. *Id.*

Over the next two weeks, MuniCap became aware that Wilson had solicited business from, contracted with, or performed work for six other MuniCap clients outside of his consulting agreement: Youngblood; the City of Hardeeville, South Carolina; SRE Santini, LLC; the City of North Myrtle Beach, South Carolina; Weber USA Corporation; and Public State Ports Authority. *Id.* ¶¶ 21–36. Several of these clients accidentally emailed Wilson at his former MuniCap email address, and those communications revealed that Wilson had shared documents obtained during his employment with MuniCap and redirected documents intended for MuniCap to his private accounts. *Id.* ¶¶ 27, 30, 34.

Although MuniCap instructed Wilson to return his company computer upon his resignation, he kept it and used confidential information stored on it to solicit MuniCap's clients. *Id.* ¶ 35. MuniCap believes that "Wilson has used and relied upon MuniCap's confidential

information and trade secrets" such as "data related to the cost of . . . projects, development plans for particular properties, and the results of calculations obtained through the use of MuniCap's computer models," which are "highly complex calculations that were developed by MuniCap and are not publicly available." *Id.* ¶ 38.

MuniCap filed this lawsuit on April 30, 2024, seeking damages for breach of contract (Count I), tortious interference with contractual relationships (Count II), and violations of the Maryland Uniform Trade Secrets Act, Md. Code Ann., Com. Law § 11-1202(a) (Count III). ECF 1. MuniCap initially sought a temporary restraining order and preliminary injunction, which this Court denied on June 17, 2024. ECF 27. This Court also denied Wilson's motion to dismiss based on lack of personal jurisdiction, and deferred ruling on Wilson's motion to dismiss for failure to state a claim until it was ripe. *Id.* This Court concluded that Wilson had minimum contacts with Maryland because he had worked for a Maryland company for 15 years, regularly accessing the server located in Maryland for his job and having regular communication with MuniCap's president and other employees in Maryland. ECF 30 at 104:10–106:3. This court found that the claims against Wilson in this case arose out of those connections and Wilson's longtime employment relationship with MuniCap. *Id.* at 106:9–13.

In its Amended Complaint, MuniCap asserts the same three causes of action against Wilson and also asserts the tortious interference and trade secrets claims against WSPF. ECF 63. The instant motion ensued.

## II.   LEGAL STANDARDS

WSPF's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(2) challenges this Court's personal jurisdiction. Under Rule 12(b)(2), the burden is "on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence." *Combs v.*

*Bakker*, 886 F.2d 673, 676 (4th Cir. 1989); *see also Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014); *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (citing *Mylan Lab'ys, Inc. v. Akzo, N.V.*, 2 F.3d 56, 59–60 (4th Cir. 1993)). When "a district court decides a pretrial personal jurisdiction motion without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of personal jurisdiction." *Carefirst of Md.*, 334 F.3d at 396 (citing *Combs*, 886 F.2d at 676). To determine whether the plaintiff has met this burden, "the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs*, 886 F.2d at 676. The court need not "look solely to the plaintiff's proof in drawing" all reasonable inferences in plaintiff's favor and may also look at the defendant's proffered proof and assertions regarding defendant's lack of contacts with the forum state. *Mylan Lab'ys, Inc.*, 2 F.3d at 62. "When the existing record is inadequate to support personal jurisdiction over a defendant, the plaintiff is entitled to jurisdictional discovery if it can demonstrate that such discovery would yield 'additional facts' that would 'assist the court in making the jurisdictional determination.'" *FrenchPorte IP, LLC v. Martin Door Mfg., Inc.*, Civ. No. TDC-14-0295, 2014 WL 4094265, at *5 (D. Md. Aug. 14, 2014) (quoting *Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 395 F.3d 1315, 1323 (Fed. Cir. 2005)) (citing *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) ("[C]ourts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is clearly frivolous.").

To exercise personal jurisdiction over a non-resident defendant, a court must determine that (1) the exercise of jurisdiction is authorized under the state's long-arm statute, pursuant to Federal Rule of Civil Procedure 4(k)(1)(A); and (2) the exercise of jurisdiction conforms to the Fourteenth Amendment's due process requirements. *Carefirst of Md.*, 334 F.3d at 396. When

6

interpreting the reach of Maryland's long-arm statute, a federal district court is bound by the interpretations of the Maryland Supreme Court. *See Carbone v. Deutsche Bank Nat'l Tr. Co.*, Civ. No. RDB-15-1963, 2016 WL 4158354, at *5 (D. Md. Aug. 5, 2016); *Snyder v. Hampton Indus., Inc.*, 521 F. Supp. 130, 135 (D. Md. 1981), *aff'd*, 758 F.2d 649 (4th Cir. 1985); *see also Mylan Lab'ys*, 2 F.3d at 61 (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). Moreover, courts must address both prongs of the personal jurisdiction analysis, despite Maryland courts consistently holding that "the state's long-arm statute is coextensive with the limits of personal jurisdiction set out by the due process clause of the Constitution." *Carefirst of Md.*, 334 F.3d at 396; *see also Bond v. Messerman*, 391 Md. 706, 721, 895 A.2d 990, 999 (2006); *CSR, Ltd. v. Taylor*, 411 Md. 457, 472, 983 A.2d 492, 501 (2009) (noting that the personal jurisdiction analysis "entails dual considerations"). It is not "permissible to simply dispense with analysis under the long-arm statute," *Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 141 n.6, 892 A.2d 479, 493 n.6 (2006), but "to the extent that a defendant's activities are covered by the statutory language, the reach of the statute extends to the outermost boundaries of the due process clause." *Dring v. Sullivan*, 423 F. Supp. 2d 540, 545 (D. Md. 2006) (quoting *Joseph M. Coleman & Assocs., Ltd. v. Colonial Metals*, 887 F. Supp. 116, 118 n.2 (D. Md. 1995)).

Thus, under the first prong of the analysis, the plaintiff must identify a provision in the Maryland long-arm statute that authorizes jurisdiction. *Ottenheimer Publishers, Inc. v. Playmore, Inc.*, 158 F. Supp. 2d 649, 652 (D. Md. 2001). Under the second prong, "due process requires only that . . . a defendant . . . have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). This "minimum contacts" analysis depends on the number and relationship of a

defendant's contacts to the forum state, and whether the present cause of action stems from the defendant's alleged acts or omissions in the forum state. *Id.* at 316–19.

Finally, a court may exercise two types of personal jurisdiction, "general" or "specific." *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 262 (2017). "General" jurisdiction is a fairly limited concept, since it only arises where "the continuous corporate operations within a state [are] thought so substantial and of such a nature as to justify suit against [defendant] on causes of action arising from dealings entirely distinct from those activities." *Int'l Shoe*, 326 U.S. at 318. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). In the context of a corporation, the paradigm bases for general jurisdiction are "the place of incorporation and principal place of business." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). The *Daimler* court clarified that while those paradigms are not necessarily the only bases for general jurisdiction, it would be "unacceptably grasping" to approve the exercise of general jurisdiction wherever a corporation, "engages in a substantial, continuous, and systematic course of business." *Id.* at 137–39 (declining to find that general jurisdiction lies in every state in which a corporate defendant has "sizable" sales).

"Specific" jurisdiction arises when there is an "affiliatio[n] between the forum and the underlying controversy." *Goodyear*, 564 U.S. at 919 (alteration in original); *Carefirst of Md.*, 334 F.3d at 397. To assess specific jurisdiction, the Fourth Circuit considers: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Eng'rs Corp.*

*v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009) (quoting *ALS Scan, Inc. v. Digital Serv.*

*Consultants, Inc.,* 293 F.3d 707, 712 (4th Cir. 2002)).

## III.    DISCUSSION

MuniCap argues that this Court has personal jurisdiction over WSPF because of its own

contacts with Maryland and under conspiracy and alter-ego theories. This Court disagrees, and

will address each theory below.

### A.  Traditional Personal Jurisdiction Analysis

Following the two-step process for evaluating personal jurisdiction described above, this

Court first looks to see whether any provision of Maryland's long-arm statute permits the exercise

of personal jurisdiction over WSPF. MuniCap does not identify any provision of the long-arm

statute that applies in this circumstance, instead arguing that the analysis "merges" with the

constitutional analysis. ECF 90 at 12. Maryland courts have been clear, though, that analysis under

the long-arm statute is still required. *Pinner v. Pinner*, 467 Md. 463, 479, 225 A.3d 433, 442 (2020)

("Both considerations must be satisfied to find an exercise of personal jurisdiction to be proper.").

The Maryland long-arm statute provides that Maryland courts can exercise personal

jurisdiction "over a person, who directly or by an agent:"

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply goods, food, services, or manufactured products in the State;

(3) Causes tortious injury in the State by an act or omission in the State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

(5) Has an interest in, uses, or possesses real property in the State; or

(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

Md. Code, Cts. & Jud. Proc. § 6-103(b).

The first, second, fifth, and sixth provisions are patently inapplicable here, because WSPF is not alleged to have (and has adduced evidence that it has not) transacted business, contracted, possessed property, or insured anything in Maryland. The fourth provision is equally inapplicable to WSPF. While MuniCap has alleged that WSPF caused tortious injury in the State by an act or omission outside the State, it has not alleged that WSPF (and WSPF has adduced evidence that it has not) regularly did or solicited business or engaged in any other persistent course of conduct in Maryland or derived substantial revenue from Maryland.

The only remaining possible provision is the third, requiring that a defendant have "caused tortious injury in the State by an act or omission in the State." 6-103(b)(3). Without making specific reference to this subsection, MuniCap appears to argue that WSPF "targeted" Maryland and its resident, MuniCap, with tortious conduct and that MuniCap's records resided on a cloud server "managed by the IT department located at the MuniCap office in Maryland." ECF 90 at 12. Those allegations do not amount to "an act or omission in the State" as required by the long-arm statute.

While the case is unpublished, *Contiem v. Gullion*, 2024 WL 4349689, Civil Action MJM-23-2511 (D. Md. Sept. 30, 2024), is persuasive. In that case, a Delaware corporation headquartered in Annapolis, Maryland ("Orbis") entered into an asset purchase agreement with a Minnesota company and, as part of that transaction, hired a Minnesota resident to work remotely from Minnesota. *Id.* at *1–2. That individual, Ms. Gullion, signed an agreement containing confidentiality, non-solicitation, and non-compete provisions. *Id.* at *1. Ms. Gullion attended one meeting in Maryland as part of her employment with Orbis. *Id.* at *2. Weeks later, Ms. Gullion

left Orbis and formed a competing company, WRL, in Minnesota. *Id.* Orbis sued for breach of contact and trade secrets violations. *Id.* at *1.

In analyzing whether the Court could exercise personal jurisdiction over Ms. Gullion or WRL in Maryland, the *Contiem* Court noted, "To satisfy 6-103(b)(3), both the injury itself and the act giving rise to the injury must have occurred and originated in Maryland." *Id.* at *5 (quoting *Orbita Telecom SAC v. Juvare LLC*, 606 F. Supp. 3d 240, 250 (D. Md. 2022)). The Court noted that because Ms. Gullion had been an employee during her attendance at the meeting in Maryland, she had not "misappropriated" any information or trade secrets at that time, and any information she may have accessed when she was no longer an employee happened when she was in Minnesota, not Maryland). *Id.* at *5–6. She also was in Minnesota, not Maryland, when she formed WRL and solicited Orbis's clients. *Id.* at *6.

The same analysis is applicable in this matter. Wilson incorporated WSPF the day before he resigned from MuniCap. He had accessed MuniCap's server and trade secret information during his 15 years as an employee, but there is no evidence that he was located in Maryland during that last day of his employment. And any actions WSPF took after its April 11 incorporation occurred in South Carolina, not Maryland. MuniCap offers no evidence that Wilson or WSPF even accessed any information in Maryland after the date of WSPF's incorporation, simply alleging that Wilson unlawfully retained his MuniCap-issued laptop and retained access to information stored thereon.[1] That laptop and information on the laptop resided in South Carolina, not Maryland. In sum, while

---

[1] Although the dates are not established with precision, the evidence adduced by MuniCap suggests that as of the time of Wilson's departure, MuniCap used a "cloud server" in an unspecified location, not a traditional "server located at the Maryland office of MuniCap." ECF 90 at 12. Thus, even if Wilson or WSPF accessed information on MuniCap's server, it does not appear that the server was located in Maryland at the time.

the tortious injury to MuniCap may have occurred in Maryland, the acts giving rise to that injury (at least those by WSPF) did not. As MuniCap is unable to meet its burden under any provision of Maryland's long-arm statute, it has not established that this Court has personal jurisdiction over WSPF. This Court therefore need not engage in the second prong of the personal jurisdiction analysis, since both prongs are required.

## B. Conspiracy

MuniCap alternatively argues that personal jurisdiction can be imputed to WSPF through Wilson in two ways: through conspiracy theory and through "alter-ego doctrine."[2] The conspiracy argument, however, is a non-starter because MuniCap alleges that Wilson and WSPF are the only two participants in the conspiracy and an LLC cannot conspire with its members. *See, e.g.*, ECF 90 at 5 (asserting that WSPF's actions "were carried out by Wilson acting as its agent."). "[A] conspiracy between a corporation and its agents, acting within the scope of their employment, is a legal impossibility." *Marmott v. Md. Lumber Co.*, 807 F.2d 1180, 1184 (4th Cir. 1986). As a result, Wilson and WSPF cannot be co-conspirators, and conspiracy theory cannot be used to impute personal jurisdiction over WSPF.

## C. Alter Ego

Finally, MuniCap alleges that WSPF should be deemed an "alter ego" of Wilson, allowing this Court to impute personal jurisdiction over WSPF. On occasion, courts have extended personal jurisdiction over individuals deemed to be alter egos of corporations otherwise subject to the court's personal jurisdiction. *See, e.g.*, *Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 433 (4th Cir. 2011).

---

[2] WSPF correctly notes that neither of these theories is pleaded in the Amended Complaint. But even if they had been, the theories would not be viable for the reasons described herein.

The inquiry, however, is not nearly as simple as MuniCap suggests. Merely acting as the "President and sole member" of a corporate entity without other employees does not negate the corporate form and mean that the person and corporate entity are alter egos. Instead, to make that determination, this Court must engage in a standard veil-piercing analysis to determine whether disregard of the corporate form is warranted. *See Maryland v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 447 (D. Md. 2019) (determining that an exercise of jurisdiction over an alter ego requires that "the court must find circumstances warranting it to pierce the corporate veil.") (quoting *Newman v. Motorola, Inc.*, 125 F. Supp. 2d 717, 722 (D. Md. 2000)).Maryland law governs the veil-piercing question because it is the forum state. *See id.* at 447. And here, the actual inquiry is one of "outsider reverse piercing," because an outside party (MuniCap) asks the Court to find WSPF liable (or, at this stage, to extend personal jurisdiction over WSPF) for actions taken by its member, Wilson. *Ross v. Ross*, 2025 WL 1874631, at *11 (Md. Ct. App. July 8, 2025) ("[O]utsider reverse piercing 'applies when an outside third party . . . urges a court to render a company liable in a judgment against its member.'") (quoting *Sky Cable, LLC v. DIRECTV, Inc.*, 886 F.3d 375, 386 (4th Cir. 2018)). The *Ross* court noted that "Maryland courts have never addressed the outsider reverse piercing of the corporate veil," but determined that if it were authorized, it would not be allowed "absent an express finding of fraud by the trial court, or case law to the contrary." *Id.* at *12–13.

There are no allegations of, and certainly no express findings of, fraud in this case, which is premised on breach of contract, tortious interference, and trade secrets allegations. Although MuniCap cites cases from other jurisdictions where corporate veils have been pierced and personal jurisdiction has been extended on an alter ego theory, Maryland "generally is more restrictive than other jurisdictions" when it comes to piercing the corporate veil. *Harte-Hanks Direct Mktg./Balt.,*

*Inc. v. Varilease Tech. Fin. Grp., Inc.*, 299 F. Supp. 2d 505, 514 (D. Md. 2004). MuniCap simply has not come close to the showing required under the law to permit outsider reverse piercing and to demonstrate that WSPF, a separate corporate entity, is Wilson's alter ego.

## IV.    CONCLUSION

For the reasons addressed above, this Court lacks personal jurisdiction over WSPF under any of the theories advanced by MuniCap. This Court recognized, earlier in this litigation, that it might become appropriate to transfer venue to the District of South Carolina pursuant to 28 U.S.C. § 1404(a), should it become evident that such transfer would serve "the convenience of parties and witnesses, [and] the interest of justice." 28 U.S.C. § 1404(a). While that particular motion for such transfer has not yet been renewed, transfer is now warranted pursuant to 28 U.S.C. § 1406(a), because it serves the interests of justice to allow this case to be adjudicated in a district with personal jurisdiction over both of the named defendants. See 28 U.S.C. § 1406(a); *Porter v. Groat*, 840 F.2d 255, 258 (4th Cir.1988) (noting that § 1406(a) allows a court to transfer a case "for any reason which constitutes an impediment to a decision on the merits in the transferor district but would not be an impediment in the transferee district").

Accordingly, this Court will deny WSPF's motion to dismiss the case for lack of personal jurisdiction but, because this Court in fact lacks personal jurisdiction over WSPF, will transfer the case to the District of South Carolina pursuant to 28 U.S.C. § 1406. This Court defers ruling as to the remaining grounds in WSPF's motion to dismiss, ECF 86, including the Rule 12(b)(6) arguments and the motion to strike certain allegations, which remain pending and should be considered in South Carolina. A separate Order follows.

Dated: November 20, 2025

_____/s/_____
Stephanie A. Gallagher
United States District Judge